**RAILWAY EXPRESS AGENCY v. BANNISTER.**

No. 7644.

Court of Civil Appeals of Texas. Austin.
Jan. 27, 1932.

Jno. B. Daniel, of Temple, for appellant.
Winbourn Pearce, of Temple, for appellee.

**BLAIR, J.**

Appellee sued appellant for damages for personal injuries, alleging that his right hip bone was broken and right hip injured on or about November 7, 1928, by being struck with an express truck which he was placing for unloading express, while in the employ of the American Railway Express Company, and because of its negligence in the manner, method, and way it required the work as undertaken by appellee to be done. Appellant filed a general denial and pleaded that, if appellee was injured, it was not on November 7, 1928, but· on February 16, 1928, when his motorcycle collided with a truck on a public highway, and while he was not in the employ of the American Railway Express Company. Judgment was for appellee for $863; hence this appeal.

■■ It was agreed that under the terms of the transfer of the property of the American Railway Express Company to appellant Railway Express Company, the latter became liable for any damages that might be due appellee for his injuries. In this connection appellee alleged and proved that at the time of his injury the American Railway Express Company, hereinafter referred to as appellant, was one of the class of employers coming under the provisions of the Workmen's Compensation Act (Vernon's Ann. Civ. St. art. 8306 et seq.), but was not a subscriber under the terms of that act. Appellant did not deny these allegations specifically, and did not plead that appellee assumed the risks ordinarily incident to his employment; and, since appellant failed to comply with the terms of the act, it is therefore not entitled to urge its propositions 3, 4, and 5, to the effect that, if appellee received any injuries while in the employ of appellant, they "were suffered from one of the risks ordinarily incident to his service." Pullman Co. v. Ransaw (Tex. Com. App.) 254 S. W. 763; American Railway Express Co. v. Truede (Tex. Civ. App.) 246 S. W. 1088; Breckenridge Storage Co. v. Hutchens (Tex. Civ. App.) 260 S. W. 684. And under the holding in those cases it is only necessary for an injured employee to show, where his employer is subject to the Workmen's Compensation Act and has failed to comply with its terms, that the employer was negligent; and that such negligence was a proximate cause of his injury.

As specific ground of negligence appellee alleged as follows: "That he was engaged in the performance of his duties in and around the passenger station of the Gulf, Colorado and Santa Fe Railway Company at Temple, Texas; that while so employed his duties in that behalf required him to do and perform the services usually performed by employees in like service, which service was the loading and unloading of express into and off of trains and pulling and operating by hand the trucks and hand-wagons furnished by the defendant for the purpose of carrying express packages from the station to the train, and from the train to the station; that on or about the said 7th day of November, 1928, it then and there became, and was the duty of the plaintiff as such employee to move by hand and man-power six of said trucks and hand wagons, to a place that would be convenient for the unloading of express from an incoming train, and in the discharge of his duty as he understood it, in the usual and ordinary way the work was done, and directed to be done by the said American Railway Express Company, the plaintiff fastened the said trucks and hand-wagons together, which said trucks and hand-wagons were of great weight, and proceeded to pull them to the place above mentioned; while so engaged in the performance of the work just described, and while himself in the exercise of reasonable and ordinary care, when he attempted to stop said trucks, by reason of the grade and of the weight of said trucks, the truck nearest to the plaintiff was caused to roll into and against the plaintiff, with great force, striking him on the right hip, and he thereby sustained the injuries complained of."

In response to special issues the jury found, in substance, as follows:

1. That appellee was injured while working for appellant, on or about November 7, 1928.

2. That appellee, at the time of his injuries, was doing the work by the methods adopted by appellant for the conduct of its business.

3. That, in adopting such methods for the conduct of its business, appellant was guilty of negligence.

4. That such negligence was a proximate cause of the injuries sustained by appellee.

■ Appellant contends by its propositions 1 and 2 that the above findings of the jury are not supported by the evidence (1) because the evidence shows that it was physically impossible for appellee to have been injured in the manner and at the time alleged; and (2) because the evidence failed to show that appellant had established the particular method of doing the work undertaken by appellee, and failed to show that specific directions were given as to any particular manner of moving and handling empty trucks by appellee. Neither contention is sustained. In passing upon these questions this court can consider only the evidence favorable to the findings of the jury.

The evidence sustaining the jury's findings that appellee was injured while working for appellant and at the time and place alleged is as follows: Appellee first entered the service of appellant in 1920, as transfer man at Temple, and held that position for eight months, when he became express messenger for appellant, running on trains out of Tem-

ple. He held the latter position until he met with an accident on February 16, 1928, when his motorcycle collided with a truck on a public highway, and from which he received injuries necessitating the amputation of his left leg between the knee and ankle. This accident was in no manner connected with his employment with appellant. Appellee's left leg was amputated in the Santa Fé Hospital at Temple, where he remained about twenty-five days, and that thereafter he used an artificial limb on his left leg. He was not thereafter regularly employed until he re-entered the service of appellant as transfer man, the position he first held, on October 24, 1928. At the time he collided with the truck his left leg was struck, but he was not thrown from his motorcycle, but himself turned it into a ditch and he fell off the motorcycle on his left side. No injury except his crushed left leg was noticed by either himself or the physicians who attended him at the time his left leg was amputated. Appellee testified that he received his injuries to his right hip on November 7, 1928, while in the employ of appellant, and as follows: "I received my injury in attempting to stop these six empty trucks which I had pulled from the Santa Fe depot to the point where I wanted to stop them for unloading No. 5. I had already reached the point. I received the injury by getting in front of trucks and pushing back on them to stop them. A truck ran against me and in some manner broke my hip."

Immediately after receiving this injury appellee walked back to the express office, and told the agent in charge that he had hurt himself, and called a taxi and went to a doctor's office, complaining of his right hip and back hurting him. He then returned and did such work as he could in getting express out of the office. He worked the following day; and on the next called for relief help, which was given on that and probably three other days before November 15, 1928, when he had to resign his position because his right leg pained him so badly that he could not do the work required of him. His physician put him in bed for two weeks for treating and resting his right hip, and he was thereafter compelled to use crutches in walking. On February 7, 1928, an X-ray picture was made of appellee's right hip, which showed that he had received a fracture to the surgical neck of the long (femur) bone of his right leg, about halfway between the hip and thigh. Another X-ray picture made May 9, 1930, showed the same fracture. After November 7, 1928, appellee's right limb became shorter and out of its normal position. Three physicians testified that they did not see how it was possible for appellee to have continued working as he did for about one week after receiving the fracture. Another physician testified as follows: "As to whether Mr. Bannister, after having received the bone frac-

ture or break that he did receive, if he did receive it, in November 1928, would have been able to walk across the street and take a taxi and go to Dr. Mason's office, and would have been able to continue to do the work of trucking around there for something like a week, will state that the X-ray picture shows that there was a fracture through the neck of the bone, there is a gap there, but the two broken ends so lap one over the other that he can walk on it and may walk on it indefinitely. The impact jammed the bones together; it is an impacted fracture."

This physician also testified, and so did others, that, if appellee had received this fracture from the motorcycle collision, it should have pained him and should have been discovered while in the hospital for the amputation of his left leg. This physician further testified that the first picture showed a recent fracture, while the second evidenced a fracture about one year old. This evidence sufficiently supports the jury's findings that appellee received his injury while working for appellant and at the time and place alleged.

The evidence establishing that appellee did the work in accordance with the method adopted by appellant and in accordance with the usual method of practice in which the work was done was as follows: The evidence shows that each truck was approximately 12 feet long and weighed about 750 pounds when empty; that when it was necessary to use six or more trucks for unloading in-coming express, appellee would hook six of them together by hooks provided for that purpose, and then pull the six to the place for loading. In doing the work by this method, appellee testified that he was doing it "in the usual and customary way. I know the usual and customary way that the work was done. I have never known it to be done in a different way to the way I was doing it. * * * In doing that work, including the attempting to stop the trucks, I was doing the work in the usual and customary way it was done for the company. * * * I learned to do that in the service of 1920." Typical of the testimony of three other employees or former employees of appellant is that of witness Fred Cawthon, as follows: "I picked them up and hooked them together. Nobody told me to do that. That was the custom."

Photographs showing six of these trucks hooked together were introduced in evidence, and as thus hooked up they were about 72 feet long and weighed about 4,200 pounds. The ground was down grade and the only way to stop the moving trucks was to push back on the front one. This evidence establishes and supports the jury's findings as to the usual manner or method by which appellee was required to do his work. It is true that C. I. Jackson, route agent and general supervisor of the operations of express

trucks, testified that he did not know employees were handling more than three or four trucks hooked together; but the foregoing evidence shows that through a long period of years the employees hooked six or more of them together, and that was the usual and customary way. That the permitting or requiring of as many as six trucks to be hooked together was negligence on the part of appellant is fully established by the testimony of Jackson, supervisor of operations, as follows: "If I had seen Mr. Bannister or anyone else carrying six of those empty trucks down to No. 5, I would have cautioned them and told them that was bad practice. In fact, I would have told them it was dangerous practice. That method of doing the work, tying that many trucks together is a dangerous practice. My company has never carried on their business with their trucks being carried down to No. 5 as many as six at a time when they are needed down there; that is a dangerous practice."

■ By proposition 6 appellant contends that the judgment should be reversed because the evidence of the jurors shows that a quotient verdict was arrived at in the case. We do not sustain the contention. The evidence on motion for a new trial shows that one juror became ill and was discharged from duty. The eleven before whom the case was tried were unable to agree upon the amount of damages to be awarded to appellee, the amounts ranging from $500 to $1,000. After discussing their differences, one juror suggested that each juror write on a piece of paper the amount of damages he would award. These eleven amounts were added and the sum divided by eleven, giving the quotient of $863. Nine of the eleven jurors testified to the effect that no agreement was had in advance of adding up the amounts and dividing by eleven, that the quotient should be the verdict. One testified on direct examination that such was the agreement, but on cross-examination stated that he was not positive about the matter, and the eleventh juror testified that he thought the jury agreed before adding up the amounts that the quotient should be the verdict. But all jurors agreed that, after the amount of the verdict was thus arrived at, the question of the amount of damages was further discussed, and that thereafter a ballot was taken and each juror voted to award $863 as damages, and each juror signed the verdict. This was not a quotient verdict, but, as held in Karotkin Furniture Co. v. Decker (Tex. Civ. App.) 32 S.W.(2d) 703, 707: "The process was used as a means of effecting a compromise among the jurors upon the important issue of the amount of damages, and the result was in fact a compromise verdict, as are all verdicts in such cases. It was not a 'quotient' verdict

such as are condemned by the courts, and appellant makes no contention that it was excessive in amount. The process resorted to by the jurors does not constitute reversible error. On the other hand, it has often been approved by our courts." See, also, cases there cited.

We find no error in the trial court's judgment, and it is affirmed.

Affirmed.